# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 27, 2012

No. 11-20555

Lyle W. Cayce
Clerk

RICHARD WINFREY, JR.,

Plaintiff – Appellant

v.

SAN JACINTO COUNTY; JAMES WALTERS, San Jacinto County Sheriff;
LACY ROGERS, Former San Jacinto County Sheriff; LENARD JOHNSON,
Former San Jacinto County Sheriff; GROVER HUFF, Texas Ranger;
RONALD DUFF, Texas Ranger; FORT BEND COUNTY; MILTON WRIGHT,
Fort Bend County Sheriff; KEITH PIKETT, Former Fort Bend County
Sheriff,

Defendants – Appellees

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:10-CV-1896

Before KING, HIGGINBOTHAM, and HAYNES, Circuit Judges.

HAYNES, Circuit Judge:[*]

Plaintiff-Appellant Richard Winfrey, Jr., appeals from the district court's grant of summary judgment on qualified immunity grounds in favor of Defendants-Appellees, a number of state actors sued in their individual and

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 11-20555

official capacities for alleged civil rights violations stemming from a murder investigation of Winfrey and his family.  For the reasons that follow, we AFFIRM in part, REVERSE in part, VACATE in part, and REMAND for proceedings consistent with this opinion.

## I. Facts and Procedural History

In August 2004, Murray Wayne Burr was found murdered in his San Jacinto County home.  The crime scene was grisly.  Officers followed a blood trail from the front room of the house, through the kitchen, and into a bedroom, where they found Burr's body.  He had been stabbed over two dozen times and had suffered a number of other injuries, including a slit throat.  There were no signs of forced entry.

Then-San Jacinto County Sheriff Lacy Rogers, and his deputy, Lenard Johnson, initially investigated.  Rogers decided to call the Texas Rangers for assistance, and they assigned Ronald Duff and Grover Huff (the "Rangers") to the case.  Huff brought in Keith Pikett, a canine handler and ostensible expert in scent-related evidence then working as a Fort Bend County deputy.

The investigation soon focused on the Winfrey family, who lived a few miles away.  The Winfreys knew Burr.  Winfrey and his sister, Megan, attended a school where Burr worked as a janitor.  They sometimes visited Burr's home.

A few weeks after the murder, Pikett conducted a "scent line-up" using two of his bloodhounds and scent samples obtained from Winfrey and Megan.  In the scent line-up, Pikett "scented" the bloodhounds on an item taken from the crime scene and then walked the dogs down a line of six cans, each containing a gauze "scent pad."  According to Pikett, both dogs alerted to the can containing Winfrey's scent; Winfrey contends that Pikett cued his dogs.

The cans were then refreshed with another set of scent pads, including a scent pad obtained from Megan.  The dogs alerted on the can containing Megan's scent.  The scent pads were again replaced, this time introducing a scent pad

2

No. 11-20555

from a suspect ultimately excluded by DNA evidence. The bloodhounds failed to alert during their final walk-throughs.

Pikett then conducted a "drop trailing" exercise. Starting at the crime scene, Huff scented the bloodhounds with what he believed was a scent sample taken from Winfrey. The dogs then followed the scent from Burr's house to the Winfrey residence. Huff later informed Pikett that he mistakenly had scented the dogs with a sample taken from Christopher Hammond, Megan's boyfriend.

Hammond denied having ever been at the crime scene, and the bloodhounds had not alerted during the scent line-up to a sample taken from him. Huff, however, observed that Hammond had a cut on his face and discovered a stain on Hammond's shoe-strings that later tested positive for blood. The investigators were unable to obtain a DNA sample from the blood stain and continued investigating the Winfreys.

Sheriff Rogers later used the scent line-up and drop-trail results to obtain a search warrant for samples of Megan's hair. Rogers failed to disclose the use of Hammond's scent pad, stating instead that the drop-trail was conducted "using the scent pad from" Winfrey. Winfrey and Megan cooperated in the collection of DNA. Forensic evidence taken from the crime scene, including hairs and fingerprints, excluded the Winfreys. The investigation stalled.

Almost two years later, David Campbell, an inmate at the Montgomery County Jail, told a jailer that he had information about Burr's murder. At the time, Richard Winfrey, Sr. ("Senior"), was an inmate at the jail and shared the same "tank" as Campbell. It was not the first time Senior had been in prison; he had been released from custody shortly before Burr's death. Campbell apparently harbored some unspecified animosity towards Senior; Senior's sister later apologized to Campbell for Senior's having "treated [him] like crap."

Deputy Johnson first visited Campbell alone. According to Johnson's June 2006 Report, Campbell claimed that Senior had admitted to killing Burr by

3

beating him and cutting open his neck, an accurate description of Burr's injuries. Senior also allegedly told Campbell that he had cut off Burr's penis and "placed it in Burr's mouth," but Burr had not been so mutilated. Senior also gave a motive for the murder: that Burr had molested one of the Winfrey children. Senior allegedly "had his kids help him get into Burr's house," where they remained during the crime.

About a month later, Johnson visited Campbell again, accompanied by Rogers. Campbell's story changed on this visit. Although he maintained that Senior admitted to killing Burr, Campbell now claimed that Senior "had stabbed and shot" Burr. There is no evidence in the record suggesting that Burr sustained a gunshot wound. Instead of the Winfrey children, Campbell now fingered one of Senior's cousins as an accomplice. Senior also allegedly confessed to having stolen two firearms, an "old .22 and . . . a .3030 long gun," and a knife from Burr's house, which he had hidden in a nearby "hollow." Burr's brother-in-law later confirmed that Burr owned a .22 caliber "semi auto and a single shot 410 [gauge] shotgun." The weapons were never found.

Campbell's "jailhouse-snitch" evidence restarted the murder investigation. Rogers procured a search warrant for Senior's DNA using the 2004 scent results and Campbell's information. Rogers's affidavit omitted Campbell's inconsistencies and falsely related that the bloodhounds had drop-trailed from Burr's house to the Winfreys' "using the scent pads that [the dogs] had alerted to" in the scent line-up.[1] For the first time (at least from the available records), Rogers reported that Campbell said that Burr had been killed in the front room of his house, information that apparently had not been made public. Pikett later conducted another scent line-up, this time with scents taken from Senior. The bloodhounds alerted each time to Senior's scent pad. *See Winfrey v. State*, 323

---

[1] The probable cause affidavit for Megan is almost identical to a search warrant affidavit used to collect Senior's DNA.

S.W.3d 875, 881 (Tex. Crim. App. 2010). Although the record appears to contain only a search warrant affidavit for Senior, Johnson obtained a search warrant to collect evidence from Winfrey on the same day.

Winfrey, Megan, and Senior were each charged with capital murder. Megan and Senior were convicted and received lengthy prison sentences. Pikett's dog-scent evidence and Campbell's statements played a large role in their trials. The jury in Senior's trial apparently convicted him based solely on the dog-scent evidence. *See id.* at 882 & n.9 ("The jury submitted a note asking, 'Is it illegal to convict solely on the scent pad evidence?'"). The Texas Court of Criminal Appeals later held that insufficient evidence supported Senior's conviction and acquitted him. *Id.* at 885.

Winfrey went to trial in June 2009. The jury found him not guilty after only thirteen minutes of deliberation. He had spent over two years in jail. By then, Pikett and his methods had come into disrepute. He retired from the Fort Bend County Sheriff's Office in early 2010.

Winfrey subsequently filed the instant suit in federal court. He brought four § 1983 claims, alleging that (1) the Defendants violated his due process rights; (2) those Defendants serving in a supervisory capacity had failed to supervise and train the investigators; (3) at least one of the Defendants failed to intervene and stop the other Defendants from violating his rights; and (4) the Defendants conspired to violate his constitutional rights.[2]

Most Defendants answered, but the Rangers filed a motion to dismiss, which the district court stayed pending limited discovery. The district court ordered the production of documents from Winfrey's state court proceedings, as well as "information about dog-scent lineups that [had] been conducted in" San

---

[2] Winfrey also brought state-law claims for malicious prosecution, abuse of process, intentional infliction of emotional distress, and civil conspiracy. He does not reurge these claims on appeal.

No. 11-20555

Jacinto County and about the Texas Department of Public Safety's ("DPS")
"policies or manuals on dog-scent lineups." Given this limited discovery, the
district court ordered the parties to file motions for summary judgment. The
Defendants complied.[3] Winfrey responded and filed a Federal Rule of Civil
Procedure 56(d) affidavit requesting additional discovery.

The district court granted summary judgment for the Defendants,
reasoning primarily that Winfrey had "[a]t best" shown that "this is a case about
a negligent investigation."[4] The district court did not explicitly rule on Winfrey's
Rule 56(d) affidavit, considering the request for additional discovery to be a
"dodge[]." It believed that "[a]dditional discovery [was] unnecessary [because]
the essential facts of the[] events [were] known." Winfrey timely appealed.

## II. The District Court's Summary Judgment Ruling[5]

Generally speaking, Winfrey's case depends on establishing the following:
(1) Pikett's methods were deficient and violated Winfrey's constitutional rights;

---

[3] The line between dismissal and summary judgment is somewhat unclear in the
record. Some Defendants couched their motions in terms of both dismissal and summary
judgment. The district court dismissed Winfrey's claims against the Rangers several months
before its summary judgment ruling. The summary judgment order occasionally uses
dismissal-like language, but it purports to grant summary judgment for all defendants.

These ambiguities do not affect our review; we treat Winfrey's appeal as arising
entirely from a grant of summary judgment. *See Enplanar, Inc. v. Marsh*, 11 F.3d 1284, 1293
(5th Cir. 1994) ("Although the district court . . . granted a dismissal as to [some parties], it also
granted summary judgment as to *all* the defendants based on evidence not contained in the
pleadings. Under these circumstances, the district court's order to dismiss the complaint as
to [some parties] is disregarded, and we instead review the grant of summary judgment as to
all defendants—including [the dismissed parties]." (citations omitted)).

[4] The district court summarily dismissed James Walters because he was not Sheriff of
San Jacinto County during the murder investigation. Winfrey does not challenge that ruling.

[5] We review a grant of summary judgment *de novo*, construing the evidence in the light
most favorable to the nonmoving party. *See, e.g.*, *United Fire & Cas. Co. v. Hixson Bros.*, 453
F.3d 283, 284-85 (5th Cir. 2006). "Unsubstantiated assertions, improbable inferences, and
unsupported speculation," however, "are not sufficient to defeat a motion for summary
judgment." *Brown v. City of Houston*, 337 F.3d 539, 541 (5th Cir. 2003). Summary judgment
is appropriate if the moving party can show that "there is no genuine dispute as to any
material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

(2) the Defendants knew it; (3) Pikett was brought into the investigation expressly to gin up false evidence against Winfrey; (4) Pikett cued the bloodhounds to alert on Winfrey's scent; and (5) the Defendants knowingly used false evidence and failed to prevent the violation of Winfrey's constitutional rights. Because Winfrey failed to show that most of the Defendants acted objectively unreasonably, the bulk of the district court's ruling stands. However, we conclude (1) that Winfrey introduced sufficient summary judgment evidence that Pikett cued his dogs such that summary judgment in Pikett's favor should be reversed, and (2) that Winfrey should have been allowed to obtain additional discovery concerning Rogers and Johnson's alleged use of false evidence to secure search and arrest warrants.

### A. Qualified and Municipal Immunity Bar Most of Winfrey's Claims

"Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Id.* at 2083 (alterations in original) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). This "objective legal reasonableness" standard "'ensure[s] that before they are subjected to suit, officers are on notice their conduct is unlawful.'" *Pearson v. Callahan*, 555 U.S. 223, 244 (2009) (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). Accordingly, "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly

violate the law." *Messerschmidt v. Millender*, 132 S. Ct. 1235, 1244-45 (2012) (internal quotation marks and citations omitted).

Most of Winfrey's § 1983 claims against those Defendants sued in their individual capacities fail because, even if he alleges violations of clearly-established constitutional rights, he lacks evidence showing that the Defendants were "on notice that their actions were unlawful." *Pearson*, 555 U.S. at 244. Winfrey assumes that it was objectively unreasonable to rely on evidence procured from Pikett's dog-scent line-ups and the drop-trail. To that end, he marshals evidence that disputes the reliability of Pikett's methods and the credibility of his credentials.

Pikett's fall from grace, however, does not show that the Rangers, Rogers, and Johnson were objectively unreasonable in seeking Pikett's assistance and then using the resulting information as part of their investigation, let alone that they actually knew that Pikett was a fraud at the time in question. Pikett enjoyed a solid reputation at the time of Burr's murder. The FBI occasionally turned to Pikett on a variety of matters, and at least one Texas court had held that scent line-ups were a "legitimate field of expertise" and that Pikett's methods properly relied upon and utilized the principles involved in the field. *See Winston v. State*, 78 S.W.3d 522, 526-29 (Tex. App.—Houston [14th Dist.] 2002, pet. denied); *see also Robinson v. State*, No. 09-06-051, 2006 WL 3438076, at *4 (Tex. App.—Beaumont Nov. 29, 2006, no pet.) (unpublished) (following *Winston* in another case involving Pikett).

Indeed, the Texas Court of Criminal Appeals only recently addressed the probative value of Pikett's evidence. It held that such evidence is admissible, but that, "standing alone, it is insufficient to establish a person's guilt beyond a reasonable doubt." *Winfrey*, 323 S.W.3d at 885. Nothing in *Winfrey* suggests that Pikett's evidence is insufficient to establish probable cause.

No. 11-20555

Although the expert affidavits proffered by Winfrey highlight numerous defects in Pikett's work, they do not claim that such errors were so obvious that they would have been apparent to officers untrained in canine handling. Accordingly, even assuming that the investigators violated Winfrey's clearly-established constitutional rights, Winfrey presents no evidence suggesting that they knew or should have known that Pikett's involvement necessarily entailed such violations. Pikett's conduct alone therefore cannot establish that the Rangers, Rogers, and Johnson knowingly passed along Pikett's allegedly false evidence, consciously disregarded a duty to intervene, or willfully conspired to violate Winfrey's constitutional rights.[6]

Winfrey's § 1983 claims against San Jacinto County and Rogers and Johnson in their official capacities fail for similar reasons.[7] These are municipal liability claims. *See, e.g.*, *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) ("Official-capacity suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" (citation omitted)). Municipal liability requires proof of an "official policy," a "final" policymaker, and the policymaker's "knowledge" of, or "deliberate indifference" to, a risk of constitutional violations. *See, e.g.*, *Burge v. St. Tammany Parish*, 336 F.3d 363, 369-73 (5th Cir. 2003); *Piotrowski v. City of Houston*, 237 F.3d 567, 578-83 (5th Cir. 2001); *see also Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). Municipal liability analysis turns on whether a plaintiff establishes that the

---

[6] The same reasoning applies to Fort Bend County Sheriff Milton Wright, who Winfrey sued in both his official and individual capacities. The individual-capacity suit against Wright also fails because nothing in the record shows that Wright had any direct, personal involvement in the Burr investigation. *See Thompson v. Steele*, 709 F.2d 381, 382 (5th Cir. 1983). Because an official-capacity suit against a county officer is a suit against a municipality, that aspect of Winfrey's suit is subsumed in the municipal liability discussion below.

[7] Winfrey does not clearly state official-capacity claims against the Rangers. To the extent that he does, the following analysis also disposes of those claims.

relevant policymaker knew or should have known that the alleged policy created a high risk of constitutional violations; this "knowledge" requirement is the "*sine qua non* of municipal liability under section 1983." *Burge*, 336 F.3d at 370.

Winfrey fails to introduce summary judgment evidence of any municipal liability element.  He complains of San Jacinto County's *de facto* policies and practices of "pursu[ing] wrongful arrests and convictions through profoundly flawed investigations and fabricated evidence, including junk science evidence." The only potential policy Winfrey identifies that relates to Pikett is the use of dog-scent evidence.  The district court ordered that San Jacinto County "produce its information about dog-scent lineups that have been conducted in the county." This evidence established that the Burr investigation was the first in San Jacinto County to use Pikett.  Municipal liability may lie for a single constitutional violation, but claims premised on *de facto* policies and acts by municipal employees must establish deliberate indifference.  *See City of Canton v. Harris*, 489 U.S. 378, 388 (1989); *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123-27 (1988).  That "generally requires that a plaintiff demonstrate 'at least a pattern of similar violations.'"  *Burge*, 336 F.3d at 370 (citation omitted). Winfrey thus cannot show that a final policymaker, presumably Rogers, knew or should have known that constitutional violations were the "obvious consequences" of Pikett's involvement.  *Id.*

### B. Some of Winfrey's § 1983 Claims Survive

Winfrey, however, presented summary judgment evidence supporting his allegations that Pikett cued his dogs during the scent line-up and that Rogers and Johnson both omitted material information and provided false statements in their search and arrest warrant affidavits in an effort to "frame" him.

*1. Pikett and the Scent Line-ups.*—The district court reasoned that Winfrey provided only speculation to show that Pikett cued his dogs. The scent line-up, however, was videotaped.  Although the video is not in the record on

appeal, the parties referenced it below, and Winfrey provided the affidavit of Steven Nicely, a police canine expert who reviewed the film.

Nicely concludes that Pikett manufactured his results, finding that "[t]he line-up procedures used by Deputy Pikett support[] [the conclusion that] behaviors the dogs do exhibit are more likely to be induced by conscious actions than unconscious actions." Nicely's conclusion rests on two general observations: First, he determined that Pikett's procedures "are more consistent with him using his ability to see inside the cans and identi[f]y which can contains the target pad than relying on his dogs to identify the can by odor."  Second, he observed actions that "were consistent with attempting to induce a behavior," *i.e.*, cuing, specifically "jerk[ing]" on the dogs' leashes and strategically stopping as he paced down the row of cans.  Nicely's affidavit comports with those of experts retained in other cases challenging Pikett's methods, which reason that Pikett cued his dogs by manipulating their leashes and by altering his footsteps during scent line-ups.  In another case, one of those experts concluded that the dogs gave no visible signs of alerting to the target scent.

Winfrey therefore raised a sufficient issue of material fact.  Pikett denies that he cued the dogs or otherwise used procedures that allowed him to "cheat." Winfrey provided summary judgment evidence that he did.  At this juncture, the evidence and all reasonable inferences must be construed in the light most favorable to Winfrey; "'[t]he ultimate truth will be determined at trial . . . .'" *Good v. Curtis*, 601 F.3d 393, 399 n.1 (5th Cir. 2010) (citation omitted).  Winfrey alleged and presented evidence that Pikett made "knowing efforts to secure a false identification," and such actions violate clearly established constitutional rights.  *Id*. at 398.  To that extent, Pikett is not entitled to qualified immunity, and we reverse the summary judgment granted to him.

*2. Rogers and Johnson's Investigation.*—Winfrey also claims that Rogers and Johnson used false information to secure search and arrest warrants

and failed to disclose exculpatory evidence. The district court acknowledged that Rogers's search affidavit to obtain DNA from Megan falsely stated that the drop-trail had used Winfrey's scent, but it concluded that the error was unintentional and that Winfrey suffered no constitutional injury because the evidence obtained bore no fruit. As to Winfrey's exculpatory-evidence argument, the district court focused on whether Winfrey could show that Rogers and Johnson knew of the infirmities underpinning Pikett's methods. The record, however, suggests that Rogers and Johnson may have acted recklessly in submitting warrant affidavits that contained false statements and material omissions that affected Winfrey's constitutional rights even without respect to the question of Pikett's methods.

Even if there is a violation of a clearly-established constitutional right, a plaintiff must still prove the objective unreasonableness of the complained-of act. Because the alleged predicate constitutional injury here concerns search and arrest warrant affidavits, we turn to Fourth Amendment principles.

The fact that a neutral magistrate issues a warrant is not dispositive of whether an officer's underlying actions were objectively reasonable. *See Messerschmidt*, 132 S. Ct. at 1245. Qualified immunity will not attach if a "reasonably well-trained officer in [the officer's] position would have known that his affidavit failed to establish probable cause." *Malley v. Briggs*, 475 U.S. 335, 345 (1986).

Objective reasonableness in this context depends in part on the information available to the officer. *See Wilson v. Layne*, 526 U.S. 603, 615 (1999). Generally, when an officer is aware of material information casting doubt on, or directly contrary to, the information contained in a warrant affidavit, that fact may serve as evidence that "a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *United States v. Leon*, 468 U.S. 897, 922 n.23 (1984). Accordingly, the "deference accorded to a magistrate's finding of probable cause

does not preclude inquiry into the knowing or reckless falsity of the affidavit on which that determination was based." *Leon*, 468 U.S. at 914 (citing *Franks v. Delaware*, 438 U.S. 154 (1978)).

The record lacks search and arrest affidavits for Winfrey; the documents likely were destroyed in an effort to comply with an expunction order. The affidavits concerning Megan and Senior, however, suggest that Rogers and Johnson used the same affidavit language for all three Winfreys, and investigation reports indicate that warrants were obtained for Winfrey on the same day Johnson executed an arrest warrant affidavit for Megan. Notably, Rogers indicated that the drop-trail evidence and Campbell's "jailhouse snitching" established probable cause to obtain "a search warrant for the hairs of my *suspects*." (emphasis added).

These documents contain a material falsehood. They reiterate that the drop-trail from the crime scene to the Winfrey house used Winfrey's scent. Huff, however, informed Pikett that he mistakenly used Hammond's scent, and Pikett included this information in his report prepared the day after the line-ups and drop-trail were conducted. Rogers and Johnson executed the affidavits two years later, when no time exigency existed that would have explained the absence of accurate information.

The affidavits also omit irregularities in Campbell's story. According to Rogers and Johnson's contemporaneous reports: Campbell said that Senior shot and mutilated Burr—not true. Campbell first said Senior's kids assisted in the murder, then averred that it was one of Senior's cousins—a major inconsistency. Senior allegedly murdered Burr in retribution for molesting one of the Winfrey children—no corroboration of any such molestation appears in the record. Moreover, the allegedly stolen guns and knife were never found, and Burr's family reported that he previously owned a small-bore shotgun, not the .3030 caliber long rifle described by Campbell.

No. 11-20555

Johnson's arrest warrant also notably omits information concerning forensic evidence while including somewhat irrelevant facts. The affidavit recounts an altercation between Megan and a high school teacher that occurred over a year-and-a-half before the murder. Although Johnson included this questionable propensity evidence, he failed to mention that several rounds of DNA testing on forensic evidence recovered from the crime scene had excluded Megan and that the drop-trail did not use Winfrey's scent. Assuming that the affidavits for Winfrey and Megan were substantially similar, the same exculpatory information would have been left out of the affidavit for Winfrey.

Although the "threshold for establishing [the objectively unreasonable] exception is a high one," *Messerschmidt*, 132 S. Ct. at 1245, the record suggests that Winfrey may meet that threshold at least for summary judgment purposes. In the light most favorable to Winfrey, the false statement and material omissions impugn Rogers and Johnson's "objective good faith" and suggest that their "transgressions" were not "minor." *Leon*, 468 U.S. at 908.

The record indicates that Rogers and Johnson heavily relied on the false drop-trail representation and incomplete information regarding Campbell. In his search warrant affidavit for Senior's DNA, Rogers suggested that Campbell's story about Senior's confession and the drop-trail evidence implicating the "other two suspects" were the two primary reasons the officers had "enough 'P.C.' to get a search warrant." That same evidence featured prominently in Johnson's probable cause affidavit for Megan, which also omitted any reference to the consistently exculpatory DNA evidence. It is a reasonable assumption that the same defects infected the warrant affidavits for Winfrey.

Yet, "'[w]hen the Fourth Amendment demands a factual showing sufficient to comprise "probable cause," the obvious assumption is that there will be a *truthful* showing.'" *Franks*, 438 U.S. at 164-65 (citation omitted). "This does not mean 'truthful' in the sense that every fact recited in the warrant affidavit is

14

necessarily correct, for probable cause may be founded upon hearsay and upon information received from informants, as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily." *Id.* at 165. Instead, the warrant requirement imposes an obligation to "set forth particular facts and circumstances underlying the existence of probable cause, so as to allow the magistrate to make an independent evaluation of the matter." *Id.* That extends to providing facts concerning the reliability of the information and the credibility of its source and to avoiding "deliberately or reckless[ly] false statement[s]." *Id.* (describing the use of such statements in a warrant affidavit as "an unthinkable imposition upon [a magistrate's] authority").

The warrant affidavits here fail this standard. As presented to the magistrate, the affidavits' three primary pieces of evidence—the scent line-ups, drop-trail, and Campbell's story—all pointed to the Winfreys. Even if the false statement about Winfrey's scent stemmed from a cursory reading of Pikett's report, however, the use of a fact explicitly contrary to the report may reasonably be characterized as reckless here. In contrast to the typical "mistake" situation where an investigation's exigencies causes facts to be "garnered hastily," *id.*, Rogers and Johnson had several years to review the report's contents and other facts before executing the affidavits.

It was similarly problematic to omit all of the information casting doubt on Campbell's credibility and the DNA test results. Some of Campbell's inconsistencies were glaring, others minor. All undercut his reliability, and, like the DNA test results that challenged the conclusions drawn from Pikett's dog-scent evidence, none were presented to the magistrate who issued the warrants. The warrant affidavits therefore likely deprived the magistrate of the opportunity to independently weigh whether Rogers and Johnson's evidence established probable cause.

No. 11-20555

Qualified immunity, however, provides "*immunity from suit* rather than a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).[8] The question, then, is when qualified immunity attaches for such § 1983 claims. *Franks* provides helpful guiding principles. *Cf. Malley*, 475 U.S. at 344 (holding "that the same standard of objective reasonableness . . . applied in the context of a suppression hearing . . . defines the qualified immunity accorded an officer whose request for a warrant allegedly caused an unconstitutional arrest"). To show he is entitled to a *Franks* hearing, a criminal defendant challenging the veracity of a warrant affidavit must "make[] a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and [that] the allegedly false statement is necessary to the finding of probable cause." *Franks*, 438 U.S. at 155-56. That requires "allegations of deliberate falsehood or of reckless disregard for the truth, . . . accompanied by an offer of proof. [The allegations] should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. . . . Allegations of negligence or innocent mistake are insufficient." *Id.* at 171.

Applying these principles here, we conclude that Winfrey has made a sufficiently "substantial preliminary showing" to make qualified-immunity

---

[8] *Franks* crafted its remedy in light of the perceived inadequacy of extant "alternative sanctions" including "a civil suit," suggesting that § 1983 provides a post-investigation remedy for the knowing or reckless inclusion of false information, or exclusion of material exculpatory information, in warrant affidavits. 438 U.S. at 169; *see also Daniel v. Ferguson*, 839 F.2d 1124, 1129 n.12 (5th Cir. 1988) ("The [*Franks*] Court also concluded that alternative procedures, including civil suits, would not provide a sufficient remedy for untruthful affidavits."). Indeed, the Supreme Court has observed that sometimes such suits allow application of the exclusionary rule in a more efficient manner than suppression hearings. *See Malley*, 475 U.S. at 344 ("[A] damages remedy for an arrest following an objectively unreasonable request for a warrant imposes a cost directly on the officer responsible for the unreasonable request, without the side effect of hampering a criminal prosecution.").

16

summary judgment for Rogers and Johnson inappropriate at this juncture. The district court should first have allowed Winfrey to conduct additional discovery to determine whether Rogers and Johnson executed affidavits with at least "a reckless disregard for the truth," *i.e.*, acted objectively unreasonably. As noted above, Rogers considered the false information crucial to getting "enough P.C.," and the omitted information concerning Campbell's reliability and the DNA test results materially challenged the information Johnson decided to include in his arrest warrant affidavit. It may be that these errors and omissions resulted from carelessness or run-of-the-mill negligence. *See, e.g.*, *United States v. Astroff*, 578 F.2d 133, 136 (5th Cir. 1978) (en banc) (holding that allegations of "negligent misrepresentation" are insufficient to render a warrant invalid or to show entitlement to a *Franks* hearing). Yet, for qualified immunity purposes, it is also possible that they occurred out of recklessness.

Because the issue of recklessness requires inquiry into the specifics of what Rogers and Johnson knew and why they completed the affidavits as they did,[9] the district court should have allowed Winfrey additional discovery on his false-evidence claim given his threshold showing of objective unreasonableness.[10] *Cf. Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1267 (5th Cir. 1991) ("Because of the difficulties attendant to rebutting the professed state of mind

---

[9] We recognize that the subjective motive of an officer executing a facially valid warrant generally is not an appropriate inquiry. *See, e.g.*, *al-Kidd*, 131 S. Ct. at 2080-82. Winfrey, however, alleges that the affidavits were knowingly or recklessly false. Our inquiry, then, necessarily must consider what the officers knew and did in evaluating whether it was objectively reasonable for them to believe that their conduct was lawful. *Cf. Messerschmidt*, 132 S. Ct. at 1245 n.2 (criticizing the dissent's reliance "on facts outside the affidavit" when there was "no contention . . . that the affidavit was misleading in omitting any of the facts on which the dissent relie[d]"); *Leon*, 468 U.S. at 922 n.23 (noting that courts may consider "all of the circumstances" bearing on the objective reasonableness inquiry).

[10] Winfrey thus differs—at least on this issue—from the hypothetical § 1983 plaintiff with wide-ranging and conclusory allegations of officer misconduct against whom qualified immunity casts its protective shield.

of a party-opponent through summary judgment evidence, the district court should be generous in its allowance of discovery requests aimed at uncovering evidence of the moving party's state of mind."). We therefore vacate the district court's ruling as to Rogers and Johnson's alleged use of false evidence, and remand for additional discovery.

### C. Additional Summary Judgment Issues Concerning the Counties

Before addressing the district court's treatment of Winfrey's Rule 56(d) affidavit, we briefly discuss two summary judgment issues bearing on Fort Bend and San Jacinto Counties' municipal liability. Winfrey alleges that San Jacinto County maintained *de facto* policies and practices that permitted "wrongful convictions and arrests through profoundly flawed investigations and fabricated evidence, including junk science evidence." Because Rogers presumably was San Jacinto County's final policymaker for the Burr case, Winfrey need not have shown deliberate indifference to establish the County's culpability for Rogers's conduct in executing his warrant affidavits. *See Praprotnik*, 485 U.S. at 123-27. The patent unconstitutionality of presenting false information to or materially misleading a magistrate would allow a presumption that Rogers "was not only aware of the specific polic[ies], but was also aware that a constitutional violation most likely [would] occur." *Burge*, 336 F.3d at 370 (citation omitted).

Winfrey also brings a failure-to-train and supervise claim against San Jacinto County. This claim necessarily is premised on Johnson's actions and, thus, *respondeat superior*.[11] These types of municipal liability claims do require evidence of deliberate indifference. *See, e.g.*, *Connick v. Thompson*, 131 S. Ct. 1350, 1360 (2011) (noting, in rejecting a "single-incident" municipal liability

---

[11] "A plaintiff must show that (1) the municipality's training policy or procedure was inadequate; (2) the inadequate training policy was a 'moving force' in causing violation of the plaintiff's rights; and (3) the municipality was deliberately indifferent in adopting its training policy." *Valle v. City of Houston*, 613 F.3d 536, 544 (5th Cir. 2010) (citations omitted).

claim, that "[w]ithout notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights"). The district court, however, allowed discovery only of information concerning San Jacinto County's dog-scent line-ups. That evidence did not specifically address the elements of a supervisory claim premised on the use of false evidence.

Winfrey, however, has forfeited these points by failing to specifically make either argument on appeal. *See, e.g.*, *Gen. Universal Sys. v. HAL, Inc.*, 500 F.3d 444, 454 (5th Cir. 2007). Moreover, he frames the municipal liability issue as one that turns on San Jacinto County's knowledge of Pikett's "fraud" and the availability of discovery to that end. Because Winfrey cannot show that San Jacinto County knew or should have known that its employees would violate his rights by using Pikett for the first time, his municipal liability claims against San Jacinto County fail. We affirm the district court on this issue.

The district court also did not err in granting summary judgment on Winfrey's supervisory claims against Fort Bend County. Pikett notes that he was assigned by Fort Bend County to work on the Burr investigation in the regular scope of his employment. Accordingly, Fort Bend County could be liable under § 1983 if it knew or should have known that Pikett gamed the results of his dog-scent investigations or otherwise used procedures that created a high risk of constitutional violations.

Winfrey, however, fails to make the more basic showing of sufficiently identifying and describing the inadequacies of a Fort Bend County policy that permitted Pikett's alleged misconduct. Instead, he essentially reiterates his belief that Pikett's missteps were so obvious that Fort Bend County Sheriff Milton Wright could have avoided knowledge of the resulting constitutional violations only by maintaining a *de facto* policy of ignorance. As demonstrated by his inability to articulate how Wright—presumably the relevant final

policymaker for this issue—was personally involved, *see supra* note 6, Winfrey therefore responded to summary judgment by doing little more than resting on conclusory, generic allegations in his complaint. *Cf. Spiller v. City of Tex. City, Police Dep't*, 130 F.3d 162, 167 (5th Cir. 1997) (noting, in motion to dismiss context, the inadequacy of such tactics in satisfying the heightened pleading requirements of municipal liability claims). In light of this, the district court had no obligation to permit Winfrey additional discovery against Fort Bend County. *See Int'l Shortstop*, 939 F.2d at 1267. Thus, we affirm the district court as to Winfrey's supervisory claims.

## III. Winfrey's Rule 56(d) Affidavit and Additional Discovery Requests

"When a party is not given a full and fair opportunity to discover information essential to its opposition to summary judgment, the limitation on discovery is reversible error." *Access Telecom, Inc. v. MCI Telecomms. Corp.*, 197 F.3d 694, 720 (5th Cir. 1999). Rule 56(d) allows nonmovants to identify and request discovery of such information "by affidavit or declaration." In response, "the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." FED. R. CIV. P. 56(d)(1)-(3).

Rule 56(d) "discovery motions are 'broadly favored and should be liberally granted' because the rule is designed to 'safeguard non-moving parties from summary judgment motions that they cannot adequately oppose.'" *Raby v. Livingston*, 600 F.3d 552, 561 (5th Cir. 2010) (citation omitted). As a general matter, district courts should grant "a continuance for additional discovery if [the nonmovants]: (i) requested extended discovery prior to the court's ruling on summary judgment; (ii) placed the district court on notice that further discovery pertaining to the summary judgment motion was being sought; and (iii) demonstrated to the district court with reasonable specificity how the requested discovery pertained to the pending motion." *Enplanar, Inc. v. Marsh*, 11 F.3d

1284, 1291 (5th Cir. 1994) (citations omitted). "The nonmoving party must show how the additional discovery will defeat the summary judgment motion, that is, will create a genuine dispute as to a material fact, and 'may not simply rely on vague assertions that additional discovery will produce needed, but unspecified facts.'" *Int'l Shortstop*, 939 F.2d at 1267 (citations omitted). Rule 56(d) rulings lie within the district court's sound, but "not entirely unfettered," discretion. *Id.*

Winfrey identified fifteen additional areas of discovery that he contended were necessary to adequately respond to the Defendants' summary judgment motions. For most requests, the district court did not abuse its discretion in denying further discovery. As discussed above, the district court abused its discretion, however, by not allowing Winfrey to probe why Rogers and Johnson failed to disclose in their warrant affidavits that the drop-trail used Hammond's scent, that Campbell gave inconsistent statements—some of which contradicted known facts—and that various DNA tests had excluded the Winfreys. Such evidence was relevant to establishing the objective reasonableness of Rogers and Johnson's actions. The record as developed at summary judgment inadequately spoke to that issue.

We also conclude that the district court abused its discretion by not ordering the production of a report concerning Pikett's drop-trail exercise from another case that, according to Nicely, was a "substantively different" version of the same report produced in this case. Nicely averred that the report was under a protective order and that he could discuss it only under court order. Given this potentially material discrepancy in a heavily relied-upon report and the specificity of Winfrey's request, the district court should have allowed Winfrey access to the document. In all other respects, we conclude that the district court did not abuse its discretion in its denial of the requested discovery.

No. 11-20555

## IV. Conclusion

Winfrey adduced sufficient evidence to survive qualified-immunity summary judgment on his due process claims against Pikett, and we reverse the summary judgment granted to him as to that count. The district court erred in not ordering additional discovery essential to Winfrey's showing Rogers and Johnson's potential recklessness in using false evidence and omitting material facts in their arrest and search warrant affidavits. It also abused its discretion in denying a handful of Winfrey's Rule 56(d) discovery requests as described above; accordingly, we vacate and remand the summary judgment as to those matters. The district court properly granted summary judgment for the Defendants as to all of Winfrey's other claims, and we affirm the summary judgment in all other respects. We note that the district court remains free to reassess the affirmed discovery determinations as it deems appropriate in light of further proceedings. Accordingly, we AFFIRM in part, REVERSE in part, VACATE in part, and REMAND for proceedings consistent with this opinion. Appellant's motion for reassignment in the district court is DENIED.