# IN THE UNITED STATES COURT OF APPEALS

## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

November 26, 2013

Lyle W. Cayce
Clerk

No. 13-30116

DEIDRA CLAYTON, Individually and on behalf of Jonathan Clayton;
ANGELA BURKE,

Plaintiffs - Appellants

v.

COLUMBIA CASUALTY COMPANY; DAVID JOHNSON, Individually and
in his Official Capacity as Livingston Parish Sheriff's Deputy; WILLIE
GRAVES, Individually and in his Official Capacity as Livingston Parish
Sheriff,

Defendants - Appellees

Appeal from the United States District Court
for the Middle District of Louisiana
USDC No. 3:11-CV-845

Before JOLLY, JONES, and BARKSDALE, Circuit Judges.

PER CURIAM:[*]

In this challenge to summary judgment's being granted Appellees, primarily at issue is the qualified immunity granted Deputy David Johnson. Concerning the Deputy, the district court ruled: his use of deadly force (shooting) against Jonathan Clayton did not violate the Fourth Amendment;

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 13-30116

in the alternative, the Deputy was entitled to qualified immunity. The judgment in favor of the Deputy, Sheriff Willie Graves, and Columbia Casualty Company is AFFIRMED.

## I.

As discussed *infra*, the following facts are presented, to the greatest extent possible, in the light most favorable to Appellants Deidra Clayton and Angela Burke, decedent's mother and sister, respectively. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

Summary-judgment evidence attributable to Clayton's sister, Burke, is provided through the recording of her 911 telephone call at 6:45 a.m. the morning of the incident, 4 April 2011; her statement to law enforcement the same day, approximately one hour after the incident; her 10 May 2012 deposition; and her 30 November 2012, post-summary-judgment declaration in support of Appellants' motion to alter or amend, or for relief from, the judgment. Summary-judgment evidence attributable to Deputy Johnson is provided, *inter alia*, through the 4 April 2011 radio log recording between the Deputy and the sheriff's office; his 14 April 2011 statement to law enforcement; and his 18 September 2012 deposition.

At approximately 6:30 a.m. on 4 April 2011, Burke witnessed Clayton beating his girlfriend, Krystyna Westmoreland, on the porch of the trailer located on the back of Burke's property. Clayton beat Westmoreland on the head with a metal bar, strangled her, and threatened to kill her. Westmoreland, bleeding profusely, escaped to the front of the property where Burke invited her into Burke's house. Once inside, Burke called 911.

2

No. 13-30116

(Although, in her deposition, Burke testified she never saw Clayton hit Westmoreland with anything other than his fists, Burke reported to the 911 operator her brother had beaten his girlfriend with a metal pipe.)

At some point, Burke saw Clayton smash the windows of Westmoreland's vehicle, parked by the trailer.  Clayton walked up the driveway to Burke's house carrying a knife she described in her statement as "a long filet knife" with a seven-inch blade.  (In her deposition she stated the blade was ten to 12 inches.)  Burke then told the 911 operator she had a gun and would shoot Clayton to protect her family and herself.  As Burke heard sirens getting closer, Clayton walked back to Westmoreland's vehicle, slashed its tires with the knife, and went inside the trailer.

Deputy Johnson was dispatched to the Clayton residence and was informed the subject beat his girlfriend with some type of object, there were slashed tires, "busted windows", possibly a knife, and the suspect's sister was threatening to shoot the suspect. Though the parties disagree over whether Burke spoke with the Deputy when he arrived, at the very least Burke directed the Deputy to the trailer.

Approximately ten to 15 minutes elapsed between the Deputy's arrival and his shooting Clayton.  The parties disagree over whether Clayton went back into the trailer after the Deputy ordered him out.  According to Burke, once Clayton walked outside, he did not go back in; according to the Deputy, Clayton walked out of the trailer once, went back inside, and then walked out again.   The record correlates with the Deputy's version of events. Consequently, what follows is a description of what occurred according to the Deputy, insofar as it is not directly contradicted by Burke. *See Scott v. Harris*, 550 U.S. at 380.

3

No. 13-30116

After parking behind Westmoreland's vehicle, the Deputy ran to the trailer door with his firearm drawn and found the door locked. He holstered his weapon and told Clayton to come out, but Clayton yelled through the closed door that he had a gun. In response, the Deputy drew his firearm, backed off the porch, and again told Clayton to come out. Clayton walked out and toward the Deputy with a hand behind his back, ignored the Deputy's commands to show his hands, and repeatedly called the Deputy a "pussy" for not shooting him. Clayton "hollered": "If you're going to pull a gun on me, you better use it"; "I am going to shoot you, you fucking pussy"; and "I am going to make you shoot me. I want to commit suicide". The Deputy announced over the radio, "He's threatening to shoot!", after which the dispatcher requested all available units go to the Clayton residence because the suspect was "threatening to shoot".

Based on this exchange, the Deputy assumed Clayton was armed with a gun. As Clayton made his way back up the porch, went inside, and shut the door, the Deputy saw the weapon was instead a knife, after which he announced over the radio: "He's got a knife, he's barricaded himself back in the door". Deputy Johnson tried to get Clayton to come outside again, but Clayton only opened the door, remaining behind the closed screen. The Deputy watched Clayton use the knife to cut his neck, after which Clayton came out of the trailer and started quickly moving toward him; the Deputy announced over the radio, "He's cut himself with a knife", and then later, "He's cut himself around the neck"; the Deputy also announced over the radio "He's threatening an 8-29 by cop" (which the Deputy clarified during his deposition means suicide). Deputy Johnson repeatedly told Clayton to stop and "[l]ay the weapon down"; but Clayton kept moving toward him, yelling "I am going to make you shoot me you fucking pussy. Shoot me mother fucker. You are going to shoot me you pussy".

4

No. 13-30116

In her statement, Burke explained:  Clayton walked "real ugly like, scary like" toward the Deputy; as Clayton walked, he screamed: "Shoot me! Shoot me!", called Deputy Johnson "'pussy' because he wouldn't shoot him", and hollered other "stuff like that"; Clayton kept "aggressively walking" toward the Deputy, screaming, hollering, and throwing his hands in the air; and, although the Deputy told Clayton to "stop where you're at", Clayton would not comply and ultimately came within five feet of the Deputy before he was shot. Similarly, in her deposition, Burke testified Clayton called the Deputy a "pussy" and hollered at him: "If you're going to pull a gun on me, you better use it"; and "Shoot me, mother fucker".  (Despite her earlier statement, when asked at her deposition whether Clayton "aggressively walked" toward Deputy Johnson, she responded:  "He was holler—yes. He was hollering at him".)

As Clayton continued forward, the Deputy fired one shot, hitting Clayton in the chest and killing him.  The Deputy immediately announced "Shots fired" over his radio, after which Deputy Fiske arrived.  (After the radio log noted the time as 7:06 a.m., Deputy Johnson can be heard on the recording yelling "Shots fired! Shots fired!"  Video from Deputy Fiske's dashboard camera shows less than ten seconds passed between the "Shots fired" announcement and when he turned onto Burke's driveway.  Nevertheless, in her deposition, Burke stated she stood in the middle of her driveway for longer than a minute, and Deputy Fiske arrived a couple of minutes after the shooting.  In his video, Burke is neither seen on the driveway nor outside her house.)

In December 2011, this action was filed, *inter alia*, pursuant to 42 U.S.C. § 1983 against the Deputy for, *inter alia*, excessive and unreasonable use of deadly force; and against Sheriff Graves for, *inter alia*:  maintaining a policy and custom of ignoring the parish's policy and procedure manual, as well as failing to properly train and equip patrol deputies.   Columbia Casualty

5

No. 13-30116

Company, liability insurer for the sheriff's office and the Sheriff, was included as a party. Appellees invoked qualified immunity in their answer, and, after discovery, moved for summary judgment.

In granting summary judgment to Deputy Johnson, the district court concluded: his use of deadly force was justified by the presence of an immediate threat of serious harm or death to himself or others and, therefore, did not violate the Fourth Amendment, irrespective of whether Clayton held a knife at the moment the Deputy shot him; and, in the alternative, if the Deputy's conduct violated the Fourth Amendment, a reasonable officer in his position would not have known the use of deadly force was unlawful in the light of clearly-established law, vesting the Deputy with qualified immunity. Because there was no violation of Clayton's constitutional rights, the court granted Sheriff Graves summary judgment with respect to all claims against him in his individual and official capacity. The state-law claims were dismissed without prejudice and are not at issue in this appeal. *Clayton v. Columbia Cas. Co.*, No. 11–845, 2012 WL 5835676, at *19 (M.D. La. 16 Nov. 2012).

## II.

A summary judgment is reviewed *de novo*. *E.g.*, *Tolan v. Cotton*, 713 F.3d 299, 304 (5th Cir. 2013). It is proper if movant shows: no genuine dispute as to any material fact; and entitlement to judgment as a matter of law. FED. R. CIV. P. 56(a). "A dispute is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party." *Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012) (citation omitted). "A fact issue is 'material' if its resolution could affect the outcome of the action." *Id.* (citation omitted). As discussed *supra*, generally "all facts and inferences are construed in the light most favorable to non-movants". *Tolan*, 713 F.3d at 304 (citation omitted).

6

No. 13-30116

To avoid summary judgment, the nonmovant may not rest, *inter alia*, on conclusory allegations or unsubstantiated assertions. *E.g.*, *Tillman v. S. Wood Preserving of Hattiesburg, Inc.*, 250 F. App'x 622, 624 (5th Cir. 2007) (citation omitted); *see also Winfrey v. San Jacinto Cnty.*, 481 F. App'x 969, 974 n.5 (5th Cir. 2012) ("Unsubstantiated assertions, improbable inferences, and unsupported speculation, however, are not sufficient to defeat a motion for summary judgment".) (citation and internal quotation marks omitted). Rather, the nonmovant must set forth specific facts to show a genuine dispute. *E.g.*, *Goodson v. City of Corpus Christi*, 202 F.3d 730, 735 (5th Cir. 2000).

## A.

Deputy Johnson was sued in his official and individual capacity. On appeal, Appellants failed, however, to brief their official-capacity claims against the Deputy. Therefore, they are abandoned. *E.g.*, *Gates v. Tex. Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 438 (5th Cir. 2008) (citation omitted). As a result, for the Deputy, we consider only his individual capacity. (In the alternative, for the reasons that follow, no genuine dispute of material fact would preclude the Deputy's not being liable in his official capacity.)

Concerning that individual capacity, qualified immunity promotes the necessary, effective, and efficient performance of governmental duties, *Harlow v. Fitzgerald*, 457 U.S. 800, 807 (1982), by shielding from suit "all but the plainly incompetent or those who knowingly violate the law". *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Circ. 2008) (citation and internal quotation marks omitted); *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (qualified immunity is immunity from suit, not merely an affirmative defense to liability). Accordingly, "for review of a summary judgment upholding qualified immunity, plaintiff bears the burden of showing a genuine dispute of material fact". *Tolan*, 713 F.3d at 304 (citing *Michalik v. Hermann*, 422 F.3d 252, 262

(5th Cir. 2005) (qualified-immunity defense alters summary judgment burden of proof)).

In other words, after defendant properly invokes qualified immunity, plaintiff bears the burden to rebut its applicability. *Crostley v. Lamar Cnty., Tex.*, 717 F.3d 410, 422 (5th Cir. 2013) (quoting *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002)). To abrogate a public official's right to qualified immunity, plaintiff must show: *first*, the official's conduct violated a constitutional or statutory right; and *second*, the official's "actions [constituted] objectively unreasonable [conduct] in [the] light of clearly established law at the time of the conduct in question". *Brumfield*, 551 F.3d at 326 (alteration added) (citation omitted).

For an excessive-force claim, plaintiff clears the first prong of the qualified-immunity analysis at the summary-judgment stage by showing a genuine dispute of material fact for whether plaintiff sustained: "(1) an injury (2) which resulted from the use of force that was clearly excessive to the need and (3) the excessiveness of which was objectively unreasonable". *Ramirez v. Martinez*, 716 F.3d 369, 377 (5th Cir. 2013) (quoting *Rockwell v. Brown*, 664 F.3d 985, 991 (5th Cir. 2011)).

For the second prong at the summary-judgment stage, plaintiff must similarly show a genuine dispute of material fact for two distinct, but intertwined, elements. "The second prong of the qualified immunity test is better understood as two separate inquiries: whether the allegedly violated constitutional rights were *clearly established at the time of the incident*; and, if so, whether the [defendant's conduct] was objectively unreasonable in the light of that then clearly established law." *Hare v. City of Corinth, Miss.*, 135 F.3d 320, 326 (5th Cir. 1998) (alteration added) (emphasis in original) (citation omitted).

No. 13-30116

In the excessive-force context at issue here, although the long-established two prongs of the qualified-immunity analysis contain "objective reasonableness" elements, those prongs remain distinct and require independent inquiry. *Brumfield*, 551 F.3d at 326. Importantly, the sequence of the analysis is immaterial, *Pearson v. Callahan*, 555 U.S. 223, 236 (2009); qualified immunity may be granted without deciding the first prong if plaintiff fails to satisfy the second, *Kovacic v. Villarreal*, 628 F.3d 209, 213 (5th Cir. 2010). Deciding the second prong first is often advisable; for example, if, as here, a constitutional right is claimed to have been violated (first prong), "[t]his approach [of first addressing the second prong] comports with [the] usual reluctance to decide constitutional questions unnecessarily". *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012) (alterations added).

Appellants contend the summary judgment resulted from the district court's erroneously considering Deputy Johnson's testimony that Clayton came at him, with his hands in the air, yelling he was going to make the Deputy shoot him. Based on these statements, the court concluded the Deputy faced a threat of immediate harm and, therefore, was justified in his use of deadly force. In Appellants' motion to reconsider, which the district court subsequently denied, they attached a declaration by Burke stating Clayton never said he was going to make the Deputy shoot him. Rather, according to Appellants, it is only undisputed that "Clayton and [Deputy] Johnson were hollering back and forth", Clayton waved his arms as he walked toward the Deputy, Clayton was suicidal, and Clayton "invited [Deputy] Johnson to shoot him". According to Appellants, at the moment the Deputy shot Clayton, his "arms were at his sides as he walked".

Moreover, Appellants claim there is a substantial difference between whether Clayton yelled, "I am going to make you shoot me!" rather than "Shoot

me! Shoot me!", called Deputy Johnson a "pussy" for not shooting him, and stated: "if you're going to pull a gun on me, you better use it". But, the undisputed summary-judgment evidence shows the Deputy was confronted with an individual who attacked his girlfriend with a metal bar, damaged her vehicle, and injured himself with a knife; his sister, Burke, threatened to shoot him; Clayton claimed he had a gun; he threatened to shoot the Deputy; he continued to "holler" and failed to obey the Deputy's orders to stop; he continued to walk toward the Deputy, causing him to move back toward Burke's house, even though the Deputy had a gun pointed at him; and the Deputy stood between Clayton and the victim, and other innocent bystanders.

Appellants emphasize Burke's statement that, at the moment the Deputy shot Clayton, his arms were at his sides as he walked. They emphasize the significance of this alleged fact, claiming the "focus of the inquiry is the act that led the officer to discharge his weapon". Nevertheless, "strict reliance" on the precise moment an officer fires his weapon is inappropriate when the totality of the circumstances is "the touchstone of the reasonableness inquiry". *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1318 (10th Cir. 2009).

Finally, the parties dispute whether Clayton held a knife when he walked toward the Deputy. Appellants continue to contend Clayton did not have one. In her post-shooting statement, when asked whether she saw anything in Clayton's hands, Burke answered: "Not at that time . . . . I saw the knife earlier". When asked during her deposition whether Clayton held anything, she answered: "No, because he was flailing [his hands] up in the air. I can see whether—that his hands are empty". Burke also stated in her deposition: the knife Clayton approached her house with and used to slash Westmoreland's tires was not found near his body; rather, she found the knife

in the trailer after police left; and there was no knife near where Clayton fell after being shot.

On the other hand, Deputy Johnson explained in his 14 April 2011 statement to law enforcement and his 18 September 2012 deposition that, after announcing "Shots fired", he circled Clayton with his gun drawn until he saw Deputy Fiske arrive, then kicked the knife out of Clayton's hand. Though it is not entirely clear in Deputy Fiske's video, Deputy Johnson does kick something away from Clayton's body. The video also reflects: once by the trailer, Deputy Fiske asked: "Where's the weapon?"; Deputy Johnson pointed to the object and stated, "Right there"; and, as Deputy Fiske secured the scene, an officer stood over the knife so it was not disturbed by those arriving on the scene.

In addition to Burke's deposition and affidavit, Appellants rely on Westmoreland's deposition and statements given by first responders on the scene. (The first responders included firemen and paramedics who arrived at Burke's residence before Deputy Johnson, but did not go on scene until law enforcement arrived; once the Deputy arrived, the first responders moved on scene to assist Westmoreland.) Westmoreland claimed she saw Clayton come out of the trailer and walk toward Deputy Johnson. Although she did not see the Deputy fire his gun, she did "see [Clayton's] hands and could see that he was not holding a knife or any other object". Appellants also contend no first responder on the scene "saw a knife in Clayton's hand and none of them heard [Deputy] Johnson tell Clayton to put down a knife".

Notably, first responders did not say they did not see a knife. Rather, no first responder mentioned a knife in his statement. For example, one stated: he saw the Deputy in the driveway with his gun drawn and pointed at Clayton; the Deputy ordered Clayton to get on the ground, but Clayton would not follow these commands; and Clayton then went "up the stairs of the trailer".

11

Similarly, another stated: "[the] victim was aproching [*sic*] the officer in a hostile manner with his hand behind his back. The officer was shouting commands and the victim would not comply. The victim started to walk backwards onto the porch". Yet another explained: "We saw the deputy . . . trying to get the victim to comply . . . . The victim had his right hand behind his back . . . . We were then alerted by a female in the front residence that there was a female victim in the house with her . . . [and] the [deputy] was telling the victim to get on his knees, and show him his hands. The victim was not complying". The statements by first responders are far from enough to create a genuine dispute of material fact. *See Chappell v. City of Cleveland,* 585 F.3d 901, 913-14 (6th Cir. 2009) (statements of witnesses who did not hear police announcements did not refute detectives' testimony that they made such announcements).

Appellants contrast the facts of this case with those in *Tolan*, and claim, unlike *Tolan*, this case is not about an officer's reasonable mistake. Instead, they maintain: because Burke testified there was no knife in Clayton's hands and because Deputy Johnson is adamant Clayton held a knife, the Deputy is lying. Along this line, they contend that, "to assume [] Clayton was unarmed is to assume [Deputy Johnson] repeatedly offered false and perjured testimony". This is an unsubstantiated assertion. *See Boudreaux v. Swift Transp. Co., Inc.,* 402 F.3d 536, 540 (5th Cir. 2005) (explaining non-moving party's burden is not satisfied by "some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence"). On the other hand, there is much evidence to show Clayton held a knife, including: the knife found near Clayton's body, the cut on Clayton's neck visible in his autopsy photographs, Clayton's blood on the knife (confirmed by DNA analysis), crime scene photographs of the knife near

No. 13-30116

Clayton's body, video of an officer standing over the knife, as well as the radio-log recording between Deputy Johnson and the sheriff's office in which the Deputy stated Clayton had a knife.  In any event, whether Clayton held a knife at the moment Deputy Johnson shot him is not determinative.  Even assuming there was no knife, the Deputy is entitled to qualified immunity.

Despite evidence to the contrary, Appellants also claim a recording from Deputy Johnson's dashboard camera existed, was considered by one of Appellees' experts, and was subsequently destroyed or withheld by Appellees. As a result, they claim this court is obligated to infer the missing video was unfavorable to Appellees.  Appellants, however, do not offer supporting evidence.  "[A]t the summary judgment stage, we require evidence—not absolute proof, but not mere allegations either". *Ontiveros v. City of Rosenberg, Tex.*, 564 F.3d 379, 383 (5th Cir. 2009) (quoting *Reese v. Anderson*, 926 F.2d 494, 499 (5th Cir. 1991) (internal quotation marks omitted)).  A finding of spoliation requires the "bad faith" destruction of evidence relevant to the litigation. *Condrey v. SunTrust Bank of Ga.*, 431 F.3d 191, 203 (5th Cir. 2005) ("The Fifth Circuit permits an adverse inference against the destroyer of evidence only upon a showing of 'bad faith'".); *Rimkus Consulting Group, Inc. v. Cammarata*, 688 F. Supp. 2d 598, 612-13 (S.D. Tex. 2010). But, again, Appellants have not provided any evidence the video existed; instead, they offer only a conclusory allegation.

**1.**

As noted, exercising the above-referenced "usual reluctance to decide constitutional questions unnecessarily", *Reichle*, 132 S. Ct. at 2093, we do not reach the first prong of qualified-immunity analysis: whether a genuine dispute of material fact exists for whether Deputy Johnson's shooting Clayton violated his Fourth Amendment right against excessive force.  As discussed

13

above, showing a genuine dispute for violation of a constitutional right does not end the inquiry when qualified immunity has been invoked properly.

## 2.

A right is sufficiently clear, and therefore "clearly established", when "every 'reasonable official would have understood that what he is doing violates that right'". *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "[E]xisting precedent must [] place[] the statutory or constitutional question beyond debate". *Reichle*, 132 S. Ct. at 2093 (quoting *al-Kidd*, 131 S. Ct. at 2083). This "clearly-established" standard balances the vindication of constitutional or statutory rights and the effective performance of governmental duties by ensuring officials can "reasonably . . . anticipate when their conduct may give rise to liability for damages". *Davis v. Scherer*, 468 U.S. 183, 195 (1984). As discussed *supra*, this second-prong question of whether the law was clearly established cannot be untethered from the concomitant question of whether the challenged conduct was objectively unreasonable in the light of that clearly-established law. *Poole*, 691 F.3d at 630.

It is undisputed that, when Deputy Johnson shot Clayton, an officer had a clearly-established right to use deadly force if he harbored an objective and reasonable belief a suspect presented an "immediate threat to [his] safety". *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009); *see also Ontiveros*, 564 F.3d 379; *Young v. City of Killeen, Tex.*, 775 F.2d 1349 (5th Cir. 1985). For Appellants to prevent Deputy Johnson's succeeding on this second prong, they must show a genuine dispute of material fact on whether "every 'reasonable official would have understood'" the use of deadly force was objectively unreasonable under the circumstances and clearly-established law. *See al-*

No. 13-30116

*Kidd*, 131 S. Ct. at 2083; *Buchanan v. Gulfport Police Dep't*, No. 12-60496, 2013 WL 2421949, at *4 (5th Cir. 4 June 2013).

Appellants rely upon Louisiana State Police Investigator Kennedy's deposition, in which the Investigator supposedly stated the Deputy's use of deadly force was reasonable *solely* because Clayton was armed with a weapon; Appellants mischaracterize the Investigator's testimony. Because Investigator Kennedy concluded Clayton did have a knife at the moment the Deputy shot him, he refused to speculate as to whether the use of deadly force would have been justifiable if Clayton did not have a knife.

Appellants also rely upon Deputy Johnson's supposed admission he would not testify at trial as to whether his use of force was reasonable if Clayton was unarmed. Appellants seem to contend this statement would preclude Appellees from presenting evidence the Deputy acted reasonably. In reality, the Deputy's supposed admission is irrelevant. "[O]ur review is necessarily objective—reasonableness is our touchstone, and we lack any benefit of 20/20 hindsight". *Poole*, 691 F.3d at 630 (citation omitted); *see also Buchanan*, 2013 WL 2421949, at *5 (citation omitted).

There is no genuine dispute of material fact for the following:  Deputy Johnson was confronted by a non-compliant suspect with dangerous and violent propensities who posed a "threat of serious physical harm" to himself and others around him. *Reese*, 926 F.2d at 500-01 (citing *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)); *see also Mace v. City of Palestine*, 333 F.3d 621, 624 (5th Cir. 2003).  The danger was enhanced because the Deputy had a gun pointed at Clayton, yet Clayton continued toward the Deputy, ignoring his commands. *Reese*, 926 F.2d at 500-01 (citing *Garner*, 471 U.S. at 11).  Clayton was within five feet of the Deputy before he fired his gun.  Along that line, Clayton had clear and obvious warning of the Deputy's believing deadly force might be

15

required under the circumstances. *E.g.*, *Garner*, 471 U.S. at 11-12 (deadly force not unconstitutional when probable cause to believe crime involving threat of serious physical harm has been committed and, if feasible, suspect warned deadly force may be used). Because Appellants have not shown a genuine dispute of material fact for whether the Deputy's shooting Clayton was objectively unreasonable under clearly-established law, summary judgment based on qualified immunity was proper.

**B.**

By failing to properly present in their opening brief their claims against Sheriff Graves, Appellants have abandoned any challenge to the adverse summary judgment as it concerns the Sheriff. *Gates*, 537 F.3d at 438 (citation omitted). Along that line, their attempt to do so in their reply brief is not considered. *See Yohey v. Collins*, 985 F.2d 222, 225 (5th Cir. 1993). Because Appellants' claims against the Sheriff fail, their claim against the liability insurer, Columbia Casualty Company, fails as well.

**III.**

For the foregoing reasons, the judgment is AFFIRMED.