REVISED MARCH 25, 2013

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 6, 2013

Lyle W. Cayce
Clerk

No. 11-20906

RONALD CURTIS; CEDRIC JOHNSON; CURVIS BICKHAM,

Plaintiffs-Appellants,

v.

W. ANTHONY, Houston Police Department Sergeant; R. CHAPPELL, Houston Police Department Officer; C. W. STIVERS, Houston Police Department Officer; UNKNOWN HOUSTON POLICE DEPARTMENT EMPLOYEES; CITY OF HOUSTON; MILTON WRIGHT, Fort Bend County Sheriff; KEITH PIKETT, Former Fort Bend County Sheriff's Department Deputy; UNKNOWN FORT BEND COUNTY EMPLOYEES; FORT BEND COUNTY,

Defendants-Appellees.

Appeal from the United States District Court
for the Southern District of Texas

Before STEWART, Chief Judge, and KING and OWEN, Circuit Judges.
PER CURIAM:

Plaintiffs-Appellants, Ronald Curtis, Cedric Johnson, and Curvis Bickham (collectively, "Appellants") appeal the district court's grant of summary judgment on their claims under 42 U.S.C. § 1983 in favor of Defendants-Appellees: (i) W. Anthony, a sergeant in the Houston Police Department ("HPD"); (ii) R. Chappell, an officer in the HPD; (iii) C. W. Stivers, an officer in the HPD; (iv) the City of Houston; (v) Milton Wright, the Sheriff of Fort Bend County, Texas; (vi) Keith

Pikett, a former deputy in the Fort Bend County Sheriff's Department; and (vii) Fort Bend County (collectively, "Appellees").[1]  For the reasons provided below, we AFFIRM the district court's judgment.

## I. Background on Dog-Scent Lineups

Appellants challenge Appellees' reliance on "dog-scent lineups," which Pikett conducted and which the municipalities used to arrest, charge, and hold Appellants.

A.    Pikett's Procedures

To conduct his lineups, Pikett made use of scent-discriminating bloodhounds.  First, Pikett would obtain a scent sample from the suspect under investigation by wiping the suspect with a sterile gauze pad.  The gauze pad, containing the suspect's "human scent" and "skin cells," would be stored in a Ziploc bag until the time of the lineup.

At the time of the lineup, a second officer would arrange six cans, one containing the suspect's scent pad and the other five containing scent pads from other persons of the same gender and race.  The officer would arrange the cans approximately ten feet apart and positioned perpendicular to the wind so as to minimize the crossing of scents.

Thereafter, Pikett would expose a bloodhound to a scent sample taken from the crime scene.  The trained bloodhound would "alert" if the scent pad from any of the six cans matched the crime scene sample.  Pikett would repeat the exercise with a second bloodhound to confirm the first bloodhound's alert.

---

[1]  Appellants also assert claims against "unknown" HPD and Fort Bend County employees.  Additionally, to the extent Appellants assert claims against Anthony, Chappell, Stivers, and Wright in their official, as opposed to their individual, capacities, we address those claims in our discussion of Appellants' claims against the City of Houston and Fort Bend County.

2.    Pikett's Connection to the HPD

Although Pikett was a deputy with the Fort Bend County Sheriff's Department, he volunteered his services to the HPD.

3.    Texas Caselaw Concerning the Use of Dog-Scent Lineups

Texas state jurisprudence concerning the use of dog-scent lineups has evolved over the past decade. However, at the time of the events at issue in this case, approximately 2007 to 2009, the Texas courts uniformly had accepted Pikett as an expert on dog-scent lineups. Furthermore, the Texas courts uniformly had accepted the results of his lineups as inculpatory evidence in criminal proceedings.

The following is a representative timeline of recent Texas cases concerning the use of dog-scent lineups. Each of these cases personally involved Pikett:

> (i) Winston v. State, 78 S.W.3d 522, 527 (Tex. App. 2002) (concluding that the use of dog-scent lineups is a "legitimate field of expertise");
>
> (ii) Robinson v. State, No. 09-06-51-CR, 2006 WL 3438076, at *4 (Tex. App. Nov. 29, 2006) (unpublished) (applying Winston to reach the same conclusion);
>
> (iii) Winfrey v. State, 323 S.W.3d 875, 884-85 (Tex. Crim. App. 2010) (holding that inculpatory evidence obtained from dog-scent lineups "may raise a strong suspicion of . . . guilt," but "is merely supportive" and, "when used alone or as primary evidence, [is] legally insufficient to support a conviction");[2]
>
> (iv) State v. Smith, 335 S.W.3d 706, 712 (Tex. App. 2011) (affirming the trial court's finding that the state had failed to establish the reliability of Pikett's dog-scent lineups, but

---

[2] This "Winfrey" case, which proceeded in state court, is the predicate criminal proceeding to Winfrey v. San Jacinto County, No. 11-20555, 2012 WL 3062159 (5th Cir. Jul. 27, 2012) (unpublished), a federal constitutional tort case discussed throughout this opinion. All subsequent references to "Winfrey" refer to the federal proceeding.

declining to reach whether the use of such lineups remains a legitimate area of expertise in light of Winfrey v. State); and

(v) Powell v. State, No. 14-09-398-CR, 2011 WL 1579734, at *2 n.2, 3 (Tex. App. Apr. 21, 2011) (unpublished) (affirming the trial court's finding that Pikett's dog-scent lineups were reliable with respect to the "procedures employed in this particular case," and noting that the appellant had not challenged the facial legitimacy of dog-scent lineups).

## II. Background on Winfrey v. San Jacinto County

On July 27, 2012, this Court issued a decision in Winfrey v. San Jacinto County, No. 11-20555, 2012 WL 3062159 (5th Cir. Jul. 27, 2012) (unpublished), which resolved legal issues that directly parallel those raised in this appeal and which addressed much of the same evidence.[3] In Winfrey, the plaintiff, who was represented by the same counsel as the Appellants here, brought a similar action under 42 U.S.C. § 1983 pertaining to a dog-scent lineup conducted by Pikett. The Winfrey plaintiffs sued Fort Bend County; Pikett; and Wright; as well as San Jacinto County, Texas; various San Jacinto County officers; and various Texas Rangers.

As in the instant case, the plaintiffs argued that (i) Pikett's dog-scent lineups were a fraud; (ii) the other individual defendants knew it, and either actively conspired with Pikett or failed to intervene; and (iii) the municipal defendants had failed to establish policies to monitor the use of the lineups for fraud and unreliability. As in the instant case, the individual defendants asserted qualified immunity defenses. The municipal defendants argued that

---

[3] Winfrey is an unpublished opinion and, therefore, is not binding precedent in this Circuit. However, in light of Winfrey's significant overlap with the instant case, we quote its well-reasoned analysis where appropriate, as persuasive authority, and cite to its facts for the limited purpose of comparing and contrasting them with the instant ones in order to highlight the instant case's distinct factual posture.

there was no obligation to establish a policy to monitor the lineups, and that the absence of such a policy would have created liability only if the municipalities had failed to establish one specifically to evade liability.

The same district court judge as in the instant case granted summary judgment to all defendants. As in the instant case, the district court denied the plaintiffs' request for supplemental discovery pursuant to Federal Rule of Civil Procedure ("FRCP") 56(d).

On appeal, the Winfrey panel reversed summary judgment as to the San Jacinto County officers, citing, inter alia, a factual dispute over whether the officers had acted recklessly by submitting search and arrest warrant affidavits containing false statements and material omissions. It also reversed summary judgment as to Pikett, citing a factual dispute over whether a videotape of the dog-scent lineup at issue demonstrated that Pikett had manipulated his bloodhounds to cue false alerts during the lineups. The panel affirmed summary judgment as to the remaining defendants on qualified immunity grounds and for failure to establish municipal liability.

### III. Background on the Instant Case

A.    Facts Pertaining to Curtis

A T-Mobile store in Harris County, Texas was burglarized in June 2007. The perpetrator had pried open the store's back door and left mud at the store's entrance.

The HPD responded, and officers spotted Curtis and a passenger in a car near the store. Curtis had a lengthy criminal record.

In the car, the officers spotted a crowbar, a sledge hammer, a bolt cutter, and two tire irons. Markings on the store's back door matched markings on the crow bar. While the officers checked the driver's licenses of Curtis and the passenger, they noticed that someone had moved the crowbar from the car's center console to under the rear floorboard.

Both Curtis and the passenger were wearing muddy shoes. Additionally, the officers spotted two unopened T-Mobile phones and an unopened T-Mobile battery in the car.

Curtis and the passenger provided conflicting accounts to the HPD officers. At first, Curtis stated that the tools found in the car were his, and that he and the passenger had been using them to perform car maintenance work before stopping to eat at a restaurant next to the T-Mobile store. Later, Curtis denied that he owned the tools. At first, the passenger stated that he and Curtis had been at the store because Curtis had driven the passenger to the store to pay his T-Mobile bill. Later, the passenger stated that, after Curtis had driven him to the T-Mobile store, Curtis had attempted to break into the store using the crowbar.

The HPD officers arrested Curtis and the passenger. However, the officers released them the same day after the magistrate judge found that there was insufficient probable cause to hold them.

Stivers had been investigating a string of burglaries involving two other T-Mobile stores within the vicinity. Upon learning of Curtis's arrest, Stivers compared Curtis's driver's license photo with a still photo from a surveillance video of another T-Mobile store burglary. He determined that the photos matched.

Notwithstanding the above, a wallet, fingerprints, and blood left at one of the burglary scenes did not match Curtis. Therefore, Stivers approached Pikett to conduct a dog-scent lineup. Pikett had conducted lineups for Stivers in two prior cases.

After Curtis refused to provide a voluntary scent sample, Stivers obtained one by subpoena. Pikett used his dogs to compare Curtis's scent with scent samples taken from the three burglarized stores. Stivers obtained these scent samples weeks and, in some cases, months after the times of the burglaries.

Accordingly, the burglarized stores had experienced routine cleanings and customer traffic between the times of the burglaries and the times that Stivers obtained the scent samples. Nevertheless, the dogs alerted to a match between each store's scent sample and Curtis's scent.

Curtis again was arrested. Based on the photographic evidence and the lineup confirmation, the magistrate judge found that there was probable cause to hold him. A Harris County assistant district attorney charged Curtis with burglary and theft. Two grand juries indicted him on the charges.

The string of burglaries at T-Mobile stores continued after Curtis's arrest. After eight months in jail, Curtis was released and the charges were dropped without a trial.

B.    Facts Pertaining to Johnson and Bickham

Three people were murdered in a Houston home in November 2007. Thereafter, the perpetrators set the home on fire. When HPD officers responded to the scene, they found the charred remnants of a gasoline can, a cigarette lighter, and two guns, as well as the remains of the victims, who had been shot in the head.

The HPD assigned Anthony and Chappell to lead an investigation. Anthony and Chappell traced the charred gas can to a nearby service station, where they obtained a surveillance video of two men purchasing the can. The HPD released still photos from the surveillance video to the public, whereupon multiple witnesses identified Johnson because his distinctive girth and tattoos matched one of the men in the released photos. Some of those witnesses revealed that Johnson, at one time, had worked at an apartment complex that one of the shooting victims had managed. The witnesses reported that Johnson and the victim frequently had argued.

Johnson's alibi was that he was working at the time of the shootings. However, Johnson's present boss informed the HPD that Johnson had left work

several hours prior to the murders. Johnson's job site was situated immediately across the street from the service station where the perpetrators had purchased the gas can.

After learning of Pikett from a fellow officer, Anthony and Chappell approached him to conduct a dog-scent lineup that included Johnson. Johnson provided a voluntary scent sample. Pikett compared Johnson's scent with scent samples taken from all four items recovered at the murder scene. The dogs alerted to a match for each item.

Johnson was arrested, and the magistrate judge found that there was probable cause to hold him. The district attorney filed charges for two of the murders, and the grand jury indicted him on those charges.

A few months into Johnson's incarceration, Will Samuels, Johnson's cell mate, contacted the district attorney's office to report that Johnson had confessed to the shootings. Samuels then met with Anthony and Chappell in the presence of his attorney. He relayed to them crime scene details known only to the investigators.

In April 2008, Samuels notified Anthony and Chappell that Johnson had identified Bickham as his accomplice in the shootings. Anthony and Chappell again approached Pikett, who compared Bickham's scent with scent samples taken from the four items recovered at the murder scene. At that point, the scent samples from the murder scene were more than a year old. Nevertheless, the bloodhounds alerted to a match for three of the four items. Bickham was arrested, charged, and indicted for two of the murders.

Subsequently, Samuels recanted his statements. Indeed, Samuels confessed to perpetrating the murders himself. In May 2009, Johnson and Bickham were released, and the charges against them were dropped. Johnson had been incarcerated for approximately eighteen months, and Bickham for seven months. Later, the HPD determined that Samuels could not have

perpetrated the murders because he was working in Boston at the time of the shootings. A dog-scent lineup conducted by Pikett indicated that Samuels's scent did not match any of the items recovered at the murder scene. Samuels ultimately advised Anthony that he had falsely confessed to the murders in order to stop threats and attacks, made by gang members affiliated with Johnson, within the prison.

## C. Procedural History

Appellants brought the instant action against (i) Stivers, Anthony, and Chappell in their individual capacities; (ii) Wright in his individual capacity; (iii) the City of Houston; and (iv) Fort Bend County, pursuant to 42 U.S.C. § 1983.[4]

Among other things, Appellants alleged: (i) that Pikett had manipulated and misrepresented the results of his dog-scent lineups to manufacture fraudulent inculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83 (1963); (ii) that Anthony, Chappell, and Stivers had failed to intervene to prevent Pikett's alleged frauds; (iii) alternatively, that Anthony, Chappell, and Stivers actively had conspired with Pikett to manufacture fraudulent evidence; (iv) that Anthony and Chappell had coerced Samuels to implicate Johnson and Bickham falsely; (v) that Wright was liable for failing to train or supervise Pikett; and (vi) that Fort Bend County and the City of Houston were liable under Monell v. Department of Social Services, 436 U.S. 658 (1978), for failing to establish policies to monitor the use of dog-scent lineups for unreliability and fraud.

After limited discovery, consisting largely of an exchange of documentary evidence, including videos of Johnson's and Bickham's lineups, Appellees moved for summary judgment. In their motion, Appellees argued: (i) that no constitutional right of Appellants had been violated; (ii) regardless, that the non-

---

[4] As noted earlier, Appellants also assert claims against "unknown" HPD and Fort Bend County employees.

municipal Appellees were protected by qualified immunity, with respect to the claims brought in their individual capacities, because their actions were objectively reasonable and did not violate any clearly established rights; (iii) that Wright was not personally involved in the events at issue; (iv) that the magistrate judges' findings of probable cause, the prosecutors' filings of charges, and the grand juries' indictments had severed causation; (v) that the municipal Appellees had no obligation to establish a policy to monitor dog-scent lineups, and that the absence of such a policy would have created liability only if the municipalities had failed to establish one specifically to evade liability; (vi) that Appellants had offered no evidence to support their claims other than expert reports, which Appellees attacked as unreliable, contradictory, and conclusory; and (vii) that Appellants, in general, had offered only vague and conclusory allegations, which lacked sufficient evidentiary support.

In response, Appellants submitted an affidavit, pursuant to FRCP 56(d), requesting supplemental depositions and interrogatory discovery in order to develop additional facts to oppose Appellees' motion. The district court denied Appellants' FRCP 56(d) request as insufficiently articulated and speculative, especially in light of the non-municipal Appellees' assertions of qualified immunity. The district court then granted summary judgment in favor of Appellees, citing, inter alia, qualified immunity and insufficient evidence of constitutional violations.

Appellants pursue the same claims on appeal. However, they also challenge the district court's denial of their FRCP 56(d) request as an abuse of discretion.

## IV. Standard of Review

A.    Summary Judgment

10

This Court reviews de novo a district court's grant of summary judgment on the issue of qualified immunity and applies the same standards as the district court. Mack v. City of Abilene, 641 F.3d 547, 555 (5th Cir. 2006) (per curiam) (citation omitted). "Summary judgment is proper when the pleadings and evidence demonstrate that no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law." Pluet v. Frasier, 355 F.3d 381, 383 (5th Cir. 2004) (citation omitted); see also Fed. R. Civ. P. 56(c). When reviewing grants of summary judgment, this Court "construe[s] all facts and inferences in the light most favorable to the nonmoving party." Murray v. Earle, 405 F.3d 278, 284 (5th Cir. 2005) (citation omitted). "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails . . . to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

B.    FRCP 56(d) Requests for Supplemental Discovery

We review for abuse of discretion "the district court's decision to preclude further discovery prior to granting summary judgment." Krim v. BancTexas Grp., Inc., 989 F.2d 1435, 1441 (5th Cir. 1993) (citations omitted). Notwithstanding this discretion, FRCP 56(d) "allows for further discovery to safeguard non-moving parties from summary judgment motions that they cannot adequately oppose." Culwell v. City of Fort Worth, 468 F.3d 868, 871 (5th Cir. 2006) (citation omitted). "Such motions are broadly favored and should be liberally granted." Id. (citation omitted). Nevertheless, because qualified immunity "is an immunity from suit rather than a mere defense to liability," the district court should limit the extent of discovery if it is avoidable. See Mitchell v. Forsyth, 472 U.S. 511, 526 (1985) (4-3) (emphasis in original).

V. Discussion

11

As noted above, Appellants brought claims alleging: (i) that Pikett had manipulated and misrepresented the results of his lineups to manufacture fraudulent evidence in violation of Brady v. Maryland, (ii) that Anthony, Chappell, and Stivers had failed to intervene to prevent Pikett's alleged frauds; (iii) alternatively, that Anthony, Chappell, and Stivers actively had conspired with Pikett to manufacture fraudulent evidence; (iv) that Anthony and Chappell had coerced Samuels to implicate Johnson and Bickham; (v) that Wright was liable for failing to train or supervise Pikett; and (vi) that Fort Bend County and the City of Houston were liable under Monell v. Department of Social Services, for failing to establish policies to monitor the use of dog-scent lineups for unreliability and fraud.

On November 9, 2012, we directed counsel to "file simultaneous letter briefs addressing in detail the significance of" Winfrey, 2012 WL 3062159, which resolved legal issues that directly parallel those raised in this appeal and addressed much of the same evidence.[5] The panel in Winfrey affirmed the district court's grant of summary judgment in part, but vacated summary judgment as to two of the San Jacinto County officers and as to Pikett.

Here, for the same reasons provided in Winfrey, we affirm summary judgment as to Wright, Fort Bend County, the City of Houston, and the unknown HPD and Fort Bend County employees, on qualified immunity grounds and for failure to establish municipal liability. That said, the factual circumstances here are such that, fully applying the reasoning from Winfrey, we also affirm summary judgment as to the remaining Appellees.

---

[5] We refer to the parties' respective letter briefs as the "Appellants' Letter Br.," the "FBC Letter Br." (Wright, Pikett, Fort Bend County, and the unknown Fort Bend County employees), and the "Hous. Letter Br." (Stivers, Anthony, Chappell, the City of Houston, and the unknown HPD employees).

A.   For the same reasons provided in Winfrey, we affirm summary judgment as to Wright, Fort Bend County, the City of Houston, and the unknown HPD and Fort Bend County employees.

1.   The Applicable Law

a.   Qualified Immunity

"Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." Ashcroft v. Al-Kidd, ___ U.S. ___, 131 S. Ct. 2074, 2080 (2011) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982) (citations omitted)). "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" Id. at 2083 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987) (alterations in original)).

This inquiry into the objective legal reasonableness of the official's conduct operates to ensure that the official is on notice that his conduct is unlawful before he can be subjected to suit. Pearson v. Callahan, 555 U.S. 223, 244 (2009) (citations and internal quotation marks omitted). Thus, "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'" Al-Kidd, 131 S. Ct. at 2085 (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).

b.   Probable Cause

"[P]robable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." Ill. v. Gates, 462 U.S. 213, 245 n.13 (1983). Thus, "[p]robable cause exists when the totality of facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed

13

or was committing an offense." Mack, 641 F.3d at 552 n.1 (citation and internal quotation marks omitted).

A trial court "considers the expertise and experience of the law enforcement officials when considering what a 'reasonable person' would have concluded." Id. (citation omitted). This Court reviews the trial court's probable cause determination de novo. United States v. Lopez-Moreno, 420 F.3d 420, 430 (5th Cir. 2005) (citing Ornelas v. United States, 517 U.S. 690, 699 (1996)).

### c. Municipal Liability

"Knowledge on the part of a policymaker that a constitutional violation will most likely result from a[n] . . . official custom or policy is a sine qua non of municipal liability under section 1983." Burge v. St. Tammany Parish, 336 F.3d 363, 370 (5th Cir. 2003) (footnote omitted). Accordingly, a plaintiff must establish that the body governing a municipality, or an official to whom the body had delegated its policy-making authority, had actual or constructive knowledge of the custom or policy at issue. Id. (citation omitted).

### 2. The Panel's Analysis in Winfrey

The Winfrey panel concluded that the plaintiff's claims against the defendants, other than Pikett and the two San Jacinto County officers, "fail[ed] because, even if [the plaintiff] allege[d] violations of clearly-established constitutional rights, he lack[ed] evidence showing that the Defendants were on notice that their actions were unlawful." 2012 WL 3062159, at *4 (internal quotation marks omitted) (citing Pearson, 555 U.S. at 244 (citation omitted)).

In reaching that conclusion, the panel determined that the defendants had not been "objectively unreasonable in seeking Pikett's assistance and then using the resulting information as part of their investigation." Id. After all, at the time of the defendants' investigation, "Pikett enjoyed a solid reputation." Id. "[A]t least one Texas court had held that scent line-ups were a 'legitimate field of expertise' and that Pikett's methods properly relied upon and utilized the

14

principles involved in the field." Id. (quoting Winston, 78 S.W.3d at 527, and citing Robinson, 2006 WL 3438076, at *4). Thus, Pikett's conduct alone could not "establish that [the defendants] knowingly passed along Pikett's allegedly false evidence, consciously disregarded a duty to intervene, or willfully conspired to violate [the plaintiff's] constitutional rights." Id. at *5.

Moreover, "nothing in the record show[ed] that Wright had any direct, personal involvement in the . . . investigation." Id. at 9 n.6 (citing Thompson v. Steele, 709 F.2d 381, 382 (5th Cir. 1983)). Additionally, the panel noted that the plaintiff had failed to offer summary judgment evidence of knowledge or "any [other] municipal liability element." Id.

Nothing about the above analysis necessarily limits it to the specific facts and circumstances of Winfrey. Accordingly, because the analysis resolved legal issues that directly parallel those raised in this appeal and addressed much of the same evidence, we hold that it fully applies to Appellants' claims against Wright, Fort Bend County, the City of Houston, and the unknown HPD and Fort Bend County employees. We thus affirm the district court's grant of summary judgment as to those Appellees.

B.   Winfrey is distinguishable as to the claims against Stivers, Anthony, and Chappell.

1.   Background on Winfrey

In Winfrey, the panel concluded that the plaintiff had raised a sufficient factual issue as to whether the San Jacinto County officers had "used false information to secure search and arrest warrants and [had] failed to disclose exculpatory evidence." 2012 WL 3062159, at *6. The panel noted that, "even without respect to the question of Pikett's methods," the officers "may have acted recklessly in submitting warrant affidavits that contained false statements and material omissions that affected [the plaintiff's] constitutional rights." Id.

Specifically, the search and arrest warrant affidavits that the officers submitted had stated that a "drop-trail" from the crime scene to the plaintiff's home had used the plaintiff's scent. Id. However, the record showed that the officers knew a third person's scent had been used by mistake. See id. at *7.[6] Since the officers had executed the warrant affidavits two years after the drop-trail, the panel concluded that "no time exigency existed that would have explained the absence of accurate information." Id. Moreover, the affidavits had reported facts gleaned from an inmate informant, without disclosing several "major" inconsistencies in the informant's story. Id.

The panel noted that the Fourth Amendment's warrant requirement "imposes an obligation to set forth particular facts and circumstances underlying the existence of probable cause, so as to allow the magistrate to make an independent evaluation of the matter." Id. at *8 (citation and internal quotation marks omitted). It added that this obligation "extends to providing facts concerning the reliability of the information and the credibility of its source and to avoiding deliberately or recklessly false statements." Id. (citation and internal quotation marks omitted).

The panel observed that the "warrant affidavits here fail[ed] this standard" because they "likely deprived the magistrate of the opportunity to independently weigh whether [the officers'] evidence established probable cause." Id. at *8-9. The panel explained that the record indicated the officers had "heavily relied on the false drop-trail representation and incomplete information regarding [the informant]." Id. at *8. Indeed, in one of the search warrant affidavits, one of the officers had explained that the evidence from the drop-trail and the evidence from the informant "were the two primary reasons

---

[6] Pikett was not responsible for this mistake. See Winfrey, 2012 WL 3062159, at *7.

the officers had enough [probable cause] to get [the] search warrant." Id. (internal quotation marks omitted).

For these reasons, the panel concluded that the plaintiff had "made a sufficiently substantial preliminary showing to make [qualified immunity] summary judgment for [the officers] inappropriate at [that] juncture." Id. at *9 (internal quotation marks omitted). In reaching this conclusion, the panel noted that the plaintiff had made a "threshold showing of objective unreasonableness." Id. at *10 (footnote and citation omitted). Therefore, the district court should have allowed the plaintiff "to conduct additional discovery to determine whether [the officers had] executed affidavits with at least a reckless disregard for the truth, i.e., [had] acted objectively unreasonably." See id. at *9 (internal quotation marks omitted) (citing United States v. Astroff, 578 F.2d 133, 135-36 (5th Cir. 1978) (en banc)). Accordingly, the panel reversed the district court's summary judgment, which the district court had granted on the basis of qualified immunity. Id. at *10.

In general, the panel concluded that the district court had not abused its discretion by denying the plaintiff's request for supplemental FRCP 56(d) discovery. Id. at *12. However, the panel determined that the district court should have allowed the plaintiff limited supplemental discovery on the above-discussed issues. Id.

2.  The Parties' Arguments Concerning the Applicability of Winfrey
    a.  Appellants

In their letter brief, Appellants do not directly address whether Winfrey is distinguishable as to the claims against Stivers, Anthony, and Chappell. However, Appellants note that there is additional evidence in the instant case's record that raises a factual dispute. Appellants' Letter Br. at 3. Namely, Appellants cite to an affidavit from an assistant district attorney for Harris

County, averring that "Pikett's methodology seemed so blatantly unreliable that [the attorney] went so far as to send out an all-prosecutor email in case any other similar cases had been filed . . . based on this type of unreliable evidence." Id. at 3-4 (citation and internal quotation marks omitted).[7]

Additionally, Appellants argue that the Winfrey record on appeal did not include the videotape of the lineup in question. Id. at 4. In the instant case, by contrast, the record on appeal includes tapes of two of the lineups—Johnson's and Bickham's. Id. Appellants contend that the two tapes are additional "evidence supporting a dispute of fact" as to whether Stivers, Anthony, and Chappell actively conspired in or failed to prevent Pikett's alleged fraud. Id.[8]

b. Appellees

In response, Appellees note that Winfrey's reversal of summary judgment as to the San Jacinto County officers was predicated on possible constitutional violations "even without respect to the question of Pikett's methods." FBC Letter Br. at 4 (emphasis, citation, and internal quotation marks omitted). In other words, even if Pikett had not caused the Winfrey plaintiff any constitutional injury, the San Jacinto County officers had done so for independent reasons.

Having distinguished Winfrey, Appellees then cite to Scott v. Harris, 550 U.S. 372, 378-81 (2007), for the proposition that "when a videotape is available, the Court should view the facts in the light depicted by the videotape . . . rather than by resorting to the differing versions offered by various witnesses so as to

---

[7] The assistant district attorney did not work on the instant case other than as an expert witness for Appellants. The parties dispute whether the prosecutors who did work on this case received the above-referenced email prior to filing charges.

[8] While the record on appeal does not include a videotape of Curtis's lineup, we treat the tapes of Johnson's and Bickham's lineups as representative of Curtis's lineup and, therefore, as evidence representative of whether Stivers actively conspired in or failed to prevent Pikett's alleged fraud.

create disputed issues of fact." FBC Letter Br. at 4-5. Moreover, Appellees argue that the fact that Anthony and Chappell videotaped the lineups of Johnson and Bickham demonstrates that the officers "were not trying to hide anything" with respect to the lineups. Hous. Letter Br. at 4.

Appellees also contend that, in Winfrey, the evidence corroborating Pikett's dog-scent lineup itself—from the drop-trail and from the informant—was compromised by alleged constitutional violations. FBC Letter Br. at 5. In the instant case, by contrast, independent and untainted sources of corroboration included, with respect to Curtis: (i) his vicinity to the crime scene; (ii) the crowbar with markings matching the T-Mobile store's door, which HPD officers spotted in Curtis's car and which Curtis seemingly attempted to conceal; (iii) the unopened T-Mobile merchandise in Curtis's car; and (iv) the apparent match of Curtis's driver's license photo to the still from the surveillance video. Hous. Letter Br. at 4 n.1.[9] With Respect to Johnson and Bickham, sources of corroboration included: (i) the surveillance video of the gasoline can purchase by both men; (ii) the witnesses from the general public who identified Johnson; (iii) a motive on the part of Johnson; and (iv) a false alibi on the part of Johnson. Id.[10] Thus, Appellees contend that the instant Appellants cannot show that the HPD's reliance on Pikett's lineups caused them any harm "because probable cause would have existed . . . with or without Pikett's evidence." FBC Letter Br. at 5 (citation omitted).

Finally, Appellees note that, in the instant case, Appellants allege that Anthony and Chappell "coerced" Samuels into becoming "a jailhouse snitch." Hous. Letter Br. at 4. Appellees characterize this allegation as made up "out of

---

[9] Additional independent and untainted sources of corroboration, not cited in Appellees' letter briefs, were the inconsistent alibis of Curtis and his passenger.

[10] An additional independent and untainted source of corroboration, not cited in Appellees' letter briefs, was the information from Samuels, who identified Bickham and reported Johnson's confession.

thin air, without one shred of evidence" Id. They contend that FRCP 56(d) discovery based on this allegation would have been inappropriate because "nothing stopped Appellants from contacting [Samuels] or his attorney and obtaining an affidavit or evidence of any alleged coercion, or from presenting evidence from Johnson himself regarding [Samuels]." Id. Nothing in the record suggests that Appellants did so.

3.    Analysis

Winfrey is clearly distinguishable as to the claims against Stivers, Anthony, and Chappell. Unlike in Winfrey, the instant Appellants do not assert constitutional tort claims that are independent of Pikett's dog-scent lineups. Indeed, Appellants implicitly concede as much. In their letter brief, they fail to address the Winfrey panel's "even without respect to [Pikett]" language.

Here, unlike in Winfrey, there is sufficient evidence to extinguish any genuine dispute as to whether Stivers, Anthony, and Chappell acted objectively unreasonably by being party to Pikett's lineups. The collective record—enumerated in the previous section discussing Appellees' arguments—shows that the officers would have satisfied the standard for probable cause even without the evidence from Pikett's lineups.[11] Therefore, the Winfrey panel's reversal of summary judgment as to the San Jacinto County officers was limited to the distinct factual posture of that case.

Furthermore, the particular facts of this case provide no additional reason to reverse the district court's grant of summary judgment. The assistant district attorney's opinion of Pikett's lineups, while probative, was just that—an opinion.

---

[11] For clarity, we note that, while the magistrate judge initially determined that there was insufficient probable cause to hold Curtis, the magistrate judge made that determination before Stivers matched Curtis's driver's license photo to the still from the surveillance video. At that point, if not earlier, Stivers had sufficient probable cause to continue investigating Curtis "even without respect to" Pikett's lineups.

Indeed, it is unclear if the actual prosecutor of this case was even aware of the assistant district attorney's opinion.

Finally, as Appellants note, the instant record includes videotapes of two of the lineups, which we have reviewed. Consistent with the Supreme Court's decision in Scott, we treat those tapes as conclusive as to the facts depicted in them. See 550 U.S. at 378-81. In other words, we will not recognize a fact dispute sufficient to overturn the summary judgment if the tapes settle that dispute.

Here, the tapes are not conclusive as to Appellants' "fraud" allegations. A reasonable jury might or might not find them suggestive of a fraud by Pikett, and of a failure to prevent, or of an active participation in, that fraud by Stivers, Anthony, and Chappell. Nevertheless, there is substantial evidence corroborating probable cause. Thus, even if Pikett did manipulate or misrepresent his results, which is uncertain, Appellants were not incrementally harmed. They could have been arrested, charged, and indicted regardless. We will not disturb the district court's summary judgment in such circumstances.[12]

In sum, Winfrey is distinguishable as to the claims against Stivers, Anthony, and Chappell. Moreover, the unique facts of this case provide no alternative reason to reverse summary judgment or the district court's denial of Appellants' FRCP 56(d) request. Accordingly, we affirm the district court's grant of summary judgment as to those officers.

C.   Winfrey is distinguishable as to the claims against Pikett.

1.   Background on Winfrey

The Winfrey panel concluded that the plaintiff had raised a sufficient factual issue as to whether "Pikett [had] cued his dogs during the scent line-up" in question. 2012 WL 3062159, at *6. It explained that the scent lineup had

---

[12]  The fact that the officers willingly permitted Pikett's lineups to be officially recorded further counsels against their liability for fraud, or for the failure to prevent it.

been videotaped, but that the tape had not been included in the record on appeal. Id. Nevertheless, both parties had offered conflicting interpretations of the tape's contents. Id.

The plaintiff's expert had opined that Pikett's lineup procedures were "more consistent with him using his ability to see inside the cans and identify which can contains the target pad than relying on his dogs to identify the can by odor." Id. (internal quotation marks omitted). The expert had added that Pikett's actions "were consistent with attempting to induce a behavior, i.e., cuing, specifically 'jerking' on the dogs' leashes and strategically stopping as he paced down the row of cans." Id. (internal quotation marks omitted). Pikett, by contrast, had "denie[d] that he cued the dogs or otherwise used procedures that allowed him to 'cheat.'" Id.

Thus, the panel on appeal identified "a sufficient issue of material fact" as to whether "Pikett [had] made knowing efforts to secure a false identification." Id. (citation and internal quotation marks omitted). Such efforts would have "violate[d] clearly established constitutional rights." Id. (citation omitted). Accordingly, the panel reversed the district court's summary judgment, which the district court had granted on the basis of qualified immunity. Id.

In general, the panel concluded that the district court had not abused its discretion by denying the plaintiff's request for supplemental FRCP 56(d) discovery. Id. at *12. However, the panel determined that the district court should have allowed the plaintiff's specific request for a report that Pikett had prepared, in connection with another case, that the plaintiff's expert had alleged "was a substantially different version of the same report produced in this case." Id. The panel noted that, "[g]iven this potential material discrepancy in a

heavily relied-upon report and the specificity of [the plaintiff's] request, the district court should have allowed [the plaintiff] access to the document." Id.[13]

2. The Parties' Arguments Concerning the Applicability of Winfrey
   a. Appellants

Appellants argue that "the Winfrey Court answered a pure question of law when it credited certain expert reports and concluded that they were sufficient to create a dispute of fact" as to whether Pikett had manipulated or misrepresented the results of his lineups. Appellants' Letter Br. at 2. "Because that very same issue is now before this Court in a virtually identical fact pattern," this Court should rule the same way as to that legal question. Id.

   b. Appellees

In response, Appellees argue that "Winfrey reverse[d] the district court's grant of summary judgment . . . based upon a narrow evidentiary ruling," namely that "the video [was] not in the record on appeal." FBC Letter Br. at 4 (citation and internal quotation marks omitted). In the instant case, by contrast, the record on appeal includes videotapes of two of the lineups in question. Id.

Appellees also repeat the same arguments, provided above in the previous section, concerning independent corroborating evidence: namely, that Pikett's lineups did not cause Appellants any harm "because probable cause would have existed . . . with or without Pikett's evidence." Id. at 5 (citation omitted).

3. Analysis

Here, Winfrey again is distinguishable. In Winfrey, the plaintiff's expert submitted a report documenting his review of the dog-scent lineup at issue, which had been videotaped. The tape itself was not in the record on appeal. In the instant case, the same expert is participating on behalf of Appellants.

---

[13] This report concerned the drop-trail from the crime scene. Since the instant case did not involve a drop-trail, the report is inapplicable to the instant case's disposition.

However, unlike in Winfrey, tapes of two of the lineups are in the record on appeal, and the expert has not reviewed them. The Winfrey panel's reversal of summary judgment as to Pikett, for narrow evidentiary reasons, is distinguishable on that basis alone.

Furthermore, the particular facts of this case provide no alternative reason to reverse the district court's grant of summary judgment. Here, in contrast to Winfrey, there is independent and untainted evidence—recited in detail above—corroborating the results of Pikett's lineups. In light of that evidence, the tapes alone do not create a genuine issue of fact sufficient to overturn summary judgment.

In sum, Winfrey is distinguishable as to the claims against Pikett. Moreover, the unique facts of this case provide no alternative reason to reverse summary judgment or the district court's denial of Appellants' FRCP 56(d) request. Accordingly, we affirm the district court's grant of summary judgment as to Pikett.

## VI. Conclusion

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment as to all Appellees.